# Gary L. Cutler, P.C.

Attorney-At-Law
160 Broadway, 10th Floor, East Building
New York, NY  10038

Tel.:  (212) 227-4358
Cell:  (917) 628-9062
Email:  garycutlerlaw@gmail.com

September 3, 2024

**Via ECF and Mail**

Hon. LaShann DeArcy Hall
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

Re:  <u>United States of America v. Luz Elvira Cardona, 1:21-cr-00622(LDH)</u>

Dear Judge DeArcy Hall:

     I represent Defendant Luz Elvira Cardona in the above-captioned case.  Sentencing is scheduled in this case for September 26, 2024 at 11 am.  Please consider this letter as Ms. Cardona's Sentencing Memorandum.

     On October 19, 2023, Ms. Cardona was found guilty by jury trial of Counts Three, Four and Six of a nine count, redacted Indictment   (Presentence Report ["PSR"], ¶ 1).  Count Three charged Sex Trafficking of a Minor – Jane Doe Two in violation of 18.U.S.C. §§ 1591(a)(1), (2); (b)(1)(2).  Sex Trafficking of a Minor is a Class A Felony punishable by a minimum of 15 years to a maximum of life.   Count Four charged Transportation of a Minor – Jane Doe Two in violation of 18 U.S.C. § 2423(a).  Transportation of a Minor is a Class A felony punishable by a minimum of 10 years and a maximum of life imprisonment.  Count Six charged Travel Act Conspiracy – Cid Hernandez Sex Trafficking Organization in violation of 18 U.S.C. § 371.  Travel Act Conspiracy is a Class D Felony punishable by not more than 5 years imprisonment.

     All three counts carry a maximum fine of $250,000.

## Sentencing Guideline Calculation

     Defendant objects to the Presentence Report's Addition of 4 levels for Role in the Offense on the basis that Ms. Cardona was not an organizer or leader of criminal activity that involved five or more people or was otherwise extensive.  This enhancement was applied in the Presentence Report to Count Three, Count Four and Count Six.

Ms. Cardona was not an organizer or leader of any participant in the crimes alleged in these Counts. Ms. Cardona came to an alleged prostitution ring that was already organized when she began living with Jose Zarate Morales, his mother Blanca Hernandez and her husband Roberto Cid Dominguez. Ms. Cardona did not organize or lead any of the drivers. They were already in place. Ms. Cardona did not organize or lead Cid Dominguez, Blanca Hernandez or Jose Zarate Morales, who already had established roles in the prostitution ring. Ms. Cardona did not overlap with Jane Doe 1, who preceded her in the house where they all lived in Queens. Jane Doe 1 had nothing to say about her interaction with Luz. Similarly, Jane Doe 5 provided no testimony against Luz.

Jane Doe 3, Ibonne, testified that she arrived at Blanca's house on December 23, 2008. (Trial Transcript ["TT"], October 12, 2023, p. 1424, lines ["ls."] 10-12). Defendant's Exhibit ["Def. Ex."] A. According to Ibonne, Luz 's baby was about one year old in December 2008 when Ibonne moved into the Queens house. (TT, p. 1424, ls. 13-14). Ibonne was asked by the Government and she answered as follows:

Q: Based on your observations from the time you spent living in that house, use, what if anything did Luz do?

A: Luz was at the house. She washed clothes. She prepared food. She took care of her baby.

(TT, October 11, 2023, p 1345, l.25 to p. 1346, ls. 1-3). Def. Ex. B.

Ibonne also testified that Luz took money to the bank. She stated, "I heard them say it was – she would go to Chase, but I didn't know what a bank was until later on." (TT, p. 1359, ls. 12-14). It would appear from this testimony that Ibonne did not see Luz go to Chase, she only heard it from "them," and this was before she knew what a bank was. It also is set in the context of her testimony that she did not go on errands with Luz, so how would she know that Luz took money to the bank.

Ibonne was asked by the Government, and she answered as follows:

Q: Did you ever go on errands with Luz?

A: No.

(Def. Ex. B, TT, p. 1346, ls. 6-7).

Ibonne also testified that Luz would be the one who would hand out condoms. (Def. Ex. B, TT, p. 1352, ls. 8-12). Ibonne testified further that Ibonne's cousin Dulce drove her and she gave her a condom filled with condoms.

It is difficult to see how raising her family, going to the bank or handing out condoms was an organizer or leadership role in the prostitution activities.

2

Ibonne was also asked by the Government and she answered as follows:

Q: What kind of work did your Aunt Blanca do in connection with the chicas chicas business?

A: She gave orders to everybody.

(Def. Ex. B, TT, 1346, ls. 1-3).

So, it was not Luz who handed out orders, but rather, Blanca.

Teodoro Rojas testified that Don Cesar told him that Luz was the person who managed or handled the business. (Def. Ex. C, TT October 16, 2023, p. 1610, l. 24 to 1611, l. 2). This conversation occurred one year after he had been working with Cesar. (1611, ls. 3-5) He started working with Cesar in 2008. (Def. Ex. C, p. 1611, ls. 11-14). Teo concluded that the conversation occurred in 2009. (Def. Ex. C, p. 1611, ls.15-16). No one else heard this conversation. (Def. Ex. C, p. 1612, ls. 2-3). Teo did not consider that Cesar meant that Luz acted like the CEO of the business. (Def. Ex. C, p. 1612, ls. 7-12).

Teo was aware that Luz was a housewife. (Def. Ex. C, p. 1612, ls. 13-14). Teo agreed that she prepares the meals, washes the clothes and takes care of her children. (Def., Ex. C., p. 1612, ls. 15-17). He agreed that as a housewife, the only business she managed was her three children. (Def. Ex. C, p. 1612, ls. 18-20).

Teo also testified that he saw Luz receiving money from Antonio. (Def., Ex. C., p. 1612, ls. 21-23). Teo testified that he saw this on only one occasion. (1612, ls. 21-23). He saw this sometime between 2009 and 2011. (Def. Ex. C, p. 1613, ls. 2-4). He admitted that he did not have a discussion with Luz about the purpose of that money. (Def. Ex. C, p. 1613, ls. 5-7).

Teo's testimony concerning Luz's role is also inconsistent with Luz being an organizer or leader of the prostitution activities.

Antonio Vargas cast doubt on Luz's guilt when he told FBI Special Agent Audra Hampsch, while waiting to testify, that only two of the four defendants are guilty. (Def. Ex. D., October 4, 2023, pp. 942, 966).

Briselda testified that Nancy (Blanca Hernandez) sent her to Omar's because Briselda did not want to work anymore. (Def. Ex. E, p. 1200, ls. 4-17, ls 21-22). According to Briselda, Luz told her that if she did not want to work, they would send her to immigration. (Def. Ex. E, p. 1195, ls. 11-16). Briselda testified further that she asked Luz not to because she did not want to go back to Mexico yet. (Def. Ex. E, p. 1195, ls. 17-20). Briselda could not recall how long she had been in the U.S. before she went to live with Omar. (Def. Ex. E, p. 1200, l. 25 to 1201, l. 2). Briselda stated that she continued to work in prostitution when she went to live with Omar. (1201, ls. 3-5). Nancy drove her twice when Briselda lived with Omar. (Def. Ex. E, p. 1201, ls. 13-15). While Briselda testified that Luz visited her at Omar's house, she also testified that the

last time she saw Luz was when she left to live with Omar. This is inconsistent with Luz being an organizer or leader in Briselda's prostitution.

With this adjustment, Count 3's Offense Level is 40, not 44, Count 4's Offense Level is 34, not 38, and Count 6's Offense Level is 30, not 34. The adjusted offense level is 40. (USSG 3D1.4 (a), (b)(c)). The Career Offender enhancement adds 5 levels and the offense level is 45. In accordance with paragraph 185 of the Presentence Report, the offense level is treated as a level 43. (Chapter 5, Part A, (comment n. 2).

While Probation has calculated that Ms. Cardona's Sentencing Guidelines are life, the Government recommends "a significant sentence above the mandatory minimum term of incarceration taking into account . . . the guidelines range of life." (Government Sentencing Memorandum ["GSM"], p. 1). That is, the Government is recommending a below guidelines sentence.

The PSR also attributes a two point enhancement pursuant to U.S.S.G. § 3A1.1(b)(1) with respect to Counts Three, Four and Six because Ms. Cardona should have known that Briselda was a vulnerable victim. (PSR ¶¶ 90, 93, 97). However, Briselda testified that she did not have reason to believe her Aunt Luz knew she was fifteen years old at the time. (Def Ex. E, p. 1146, ls. 17-22). However, she also testified that she discussed her age with Luz several times. The main premise for the enhancement in the PSR is Briselda's minor age. Other factors listed in those PSR paragraphs were that Briselda had a third grade education, she lacked English speaking ability, she was undocumented, she had no legal status, she had never been to the United States before and she lacked finances. Defense counsel crossed Briselda with the fact that she spoke Spanish, lived in a predominantly Spanish speaking neighborhood in Queens, and she could have gone to the authorities at any time to bring the prostitution to an end.

With these two adjustments totaling six points, Count 3's Offense Level is 38, not 44, Count 4's Offense Level is 32, not 38, and Count 6's Offense Level is 28, not 34. With grouping, no additional points are added. (USSG § 3D1.4 (a), (b), (c)). The Career Offender enhancement adds 5 levels and the offense level is 43, not 49.

**Briselda's Testimony At Trial**

Briselda was an unreliable witness. Briselda could not recall many important details of her experience.

<u>Briselda's Direct Testimony</u>

Briselda, Jane Doe No. 2, testified that she first came to the U.S. when she was 15 years old. (Def. Ex. E, p. 1146, ls. 4-6).

Briselda could not make an in-court identification of Defendant Luz Cardona. (Def. Ex. E, 1147, ls. 18-21. Briselda was asked and she answered:

Q: Do you see your Aunt Luz in the courtroom today?

A: I can't make her out.

Q: If you need to stand up, that's fine.

A: I don't see her. I can't make her out.

The Government then attempted to show the witness a photograph of Luz. (Government Exhibit 2). (Def. Ex. E, p. 1151, l. 3). Defendant Roberto Dominquez's counsel objected that the picture was unduly suggestive and violates due process. (Def. Ex. E, p. 1153, ls. 1-8). The Court agreed that showing the photograph to the witness was unduly suggestive because the Government just asked the witness to identify Luz in the courtroom and now the Government was going to identify a picture of Luz. (Def. Ex. E, p. 1153, ls. 9-16). The Assistant U.S. Attorney asked if she could show a series of photographs at a later time during the testimony. (Def. Ex. E, p. 1153, ls. 17-18). The Court responded that the Government should raise it with the Court and the Court will make a decision at that time. (Def. Ex. E, p. 1153, ls. 22-23).

After the morning break, the Government said that they would like to revisit the photo identification. The Government proposed showing a series of photographs including a photograph of Luz. (Def Ex. E, p. 1178, ls. 7-11). The Court stated that the inability of Briselda to provide an in-court identification to be followed immediately by a photo identification, "the fact that they were so close in time that Ms. Walsh's objection had traction to me." (Def. Ex. E, p. 1178, ls. 18-24). The Court continued, "I am convinced that at this point there has been enough runway between the failed identification – in-court identification – and the proposed introduction of Government Exhibit 2." (Def. Ex, E, p. 1178, l. 25 to 1179, l. 3). Luz's attorney objected on due process grounds. (Def. Ex. E, p. 1179, ls. 6-9). Luz's attorney also objected that presenting a single photograph instead of a lineup of photographs signals the witness and is violative of due process. (Def. Ex. E, p. 1179, ls. 17-19). Counsel further objected that there was not enough of a runway between her lack of identification. (Def. Ex. E, p. 1180, ls. 6-9). Counsel also objected that it would be fairer to show a series of photographs, rather than one photograph of Luz. (Def. Ex. E, p. 1181, ls. 1-4).

Defendant Roberto Dominguez's counsel objected on the basis that the witness has likely been shown the photograph before and to make the identification from a single photograph is unduly suggestive. (Def, Ex E, p. 1181, ls. 16-21). The Court allowed the photograph to come in, stating that with respect to temporal proximity of the examination has been resolved by the passage of time and the series of intervening unrelated questions. (Def. Ex. E, p. 1183, ls. 5-12).

Briselda identified the photograph as that of her Aunt Luz. (Def. Ex. E, p. 1186, ls. 6-7). The photograph, Government Exhibit 2, was admitted into evidence and published to the jury. (Def. Ex. E, p. 1186, ls. 8-16).

Briselda stopped working in prostitution while living with Omar. (Def. Ex. E, p. 1202, ls. 23-25). Briselda was working at a brothel and was arrested by the police. (Def. Ex. E, p. 1202, ls. 1-3, ls. 8-9). When she got arrested Briselda gave the name Fernanda Lopez. (1203, ls. 19-22). While Briselda was with the police, ultimately, she told the police her age and her real

name. (Def. Ex. E, p. 1204, ls. 5-12). The police took Briselda to a house for teenagers. (Def. Ex. E, p. 1204, ls 14-15). She stayed at the house for a few months and then ran away. (Def. Ex. E, p. 1204, ls. 19-21). Briselda ultimately went back to Mexico. (Def. Ex. E, p. 1204, l. 25 to p. 1205, l. 1). After she left the house for teenagers, it was months later that Briselda went back to Mexico. (Def. Ex. E, p. 1205, ls. 6-8).

Cross Examination By Luz's Counsel

On cross-examination by Luz's counsel, Briselda could not remember that she was arrested for prostitution during May 2008. (Def. Ex. E, p. 1209, ls. 19-22). She could not remember the number of men who were running the brothel or house of assignation. (Def. Ex. E, p. 1210, ls. 9-11). Briselda could not recall how she got to the brothel that day. (Def. Ex. E, p. 1210, ls 12-21). She could not remember that she testified in the grand jury against the three men who were running the brothel. (Def. Ex. E, p. 1210, ls. 22-24). She could not remember the grand jury at all. (Def. Ex. E, p. 1210, l. 25 to 1211, l. 1). She could not recall that the men who were in charge of the brothel were of Asian descent. (Def. Ex. E, p. 1211, ls. 2-4). She did recall that all of the women who worked with her were all of Asian descent. (Def. Ex. E, p. 1211, ls. 5-8). She could not remember how many men she had sex with that day. (Def. Ex. E, p. 1211, ls. 9-11).

Briselda could not recall if she told the police that she was working with a man named Omar. (Def. Ex. E, p. 1211, l. 24 to 1212, l. 1). She did not tell the police that she was committing prostitution with her Aunt Luz. (Def. Ex. E, p. 1212, ls. 2-5). Briselda could not recall who collected the money from the prostitutes. (Def. Ex. E, p. 1217, ls. 20-22).

Briselda agreed that her aunt Luz was visibly pregnant when Briselda arrived in Queens. (Def. Ex. E, p. 1218, ls. 16-18). Briselda could not remember the date she arrived in Queens. (Def. Ex. E, p. 1218, ls. 19-21). Briselda could not remember the month she arrived in Queens. (Def. Ex. E, p. 1218, ls. 22-23). She could not remember that Luz had her baby at the end of November 2007. (Def. Ex. E, p. 1218, l. 24 to 1219, l. 1). She could not remember that she was no longer living with her aunt and family when Luz gave birth to her first son at the end of November 2007. (Def. Ex. E, p. 1219, ls. 2-7).

While Briselda claimed on direct that she had no one else to live with in the U.S., she admitted that she had an uncle Amilcar in California and an uncle Roale in North Carolina. (Def. Ex. E, p. 1219, ls. 8-16). Briselda claimed that she had not seen her uncles since she was a teenager, but had to admit at the time she lived with Luz she was still a teenager. (Def. Ex. E, p. 1220, ls. 18-21). Briselda could not remember if she stayed with Luz for a short time. (Def. Ex. E, p. 1221, ls. 4-7).

Briselda admitted that she had a cell phone. She did not call the police because she did not know how to dial the numbers. (Def. Ex. E, p. 1223, ls. 15-17). Briselda never asked the Mexican men she met how to dial the police. (Def. Ex. E, p. 1223, ls. 20-22).

When the man threatened her with a knife, Briselda did not call the police. (Def. Ex. E, p. 1222, l. 17 to p. 1223, l. 4). Even though Briselda had a cell phone, she did not call her

parents on her own because she did not know how to dial the area code. (Def. Ex. E, p. 1223, ls. 5 to 11). She complained that her aunt never told her exactly how to dial there. (Def. Ex. E, p. 1223, ls. 12-13). She claimed that she did not know then that she could have called the operator. (1223, ls. 14-15). Briselda admitted that she could have stopped someone on the street and asked how to dial Mexico. She claimed that she didn't know how, she didn't speak English, but she admitted that plenty of people in the U.S. speak Spanish. (Def. Ex. E, p. 1223, ls. 16-24). Briselda admitted that her clients were primarily Mexican men and they could have dialed Mexico for her. (Def. Ex. E, p. 1223, l. 25 to 1224, l. 2). She claimed that she didn't dare do it because of the fear she had. (Def. Ex. E, p. 1223, ls. 2-3).

While admitting she had continued presence status in the U.S., she did not know if it allowed her to stay in the U.S. for a specific period of time. (Def. Ex. E, p. 1224, ls. 13-15). Briselda did not know if she had continued presence status through April of 2025. (Def. Ex. E, p. 1224, ls. 20-22).

Briselda admitted that she previously told an NYPD detective after her arrest that she was 20 years old. (Def. Ex. B, p. 1243, ls. 4-6). Briselda could not recall telling FBI agents that Luz told her that she would work in the same restaurant as she, or possibly another restaurant. (Def. Ex. B, p. 1248, ls. 22-25).

On direct, Briselda testified that she worked at a pizza place for a few days. (Def. Ex. B, p. 1253, ls. 12-14). Briselda admitted that she told an NYPD detective after her arrest that she worked at a restaurant called Victoria's in Queens for two weeks. (Def. Ex. B, p. 1253, ls. 20-25).

Briselda could not recall that Luz was about three years older than she when Briselda first came to the U.S. (Def. Ex. B, p. 1258, ls. 8-13).

Briselda testified that at the time of her foster care, she was not living with Luz. (Def. Ex. B, p. 1258, ls. 14-16). Briselda stated that after she was arrested and then released, she was placed in foster care. (Def. Ex. B, p. 1258, ls. 17-19). Briselda said that she left the foster home without telling the foster home where she was. (Def. Ex. B, p. 1258, l. 24 to p. 1259, l. 1). Briselda could not remember the year she left the foster home. (Def. Ex. B, p. 1259, ls. 2-8). She testified that she did not have permission to leave the foster home. (Def. Ex. B, p. 1259, ls.9-11).

Briselda stated that she has a work permit. (Def. Ex. B, p. 1260, ls. 3-5). She has had a job here for the last two years. (Def. Ex. B, p. 1260, ls. 10-13). Briselda is in the process of bringing one of her sons to the U.S. (Def. Ex. B, p. 1260, l. 23 to 1261, l. 1). Briselda has a free lawyer who applied for continued presence for her. (Def. Ex. B, p. 1261, ls. 11-14).

Cross Examination By Blanca Hernandez's Counsel

When Briselda was outside of the house she lived in in Queens, she never went up to any of the people outside and said "can you help me?" (Def. Ex. B, p. 1265, ls. 1-3). She never went up to people who were outside and said, "I have been forced into prostitution, can you help me?"

(Def. Ex. B, p. 1265, ls. 10-13). When she was dropped off in apartment buildings and people were in the lobby, she never told them about her situation. (Def. Ex. B, p. 1266, ls. 5-7). When she would go into a supermarket in Queens, she would see Mexican people lots of times, but never asked for the Mexican country code in order to make a phone call to Mexico. (Def. Ex. B, p. 1267, ls. 10-16). When she was in Queens, she frequently saw police officers but never went over to one of them and told the police officer what was happening to her. (Def. Ex. B, p. 1267, l. 19 to p. 1268, l. 1).

Briselda could not recall how long she was in the U.S. (Def. Ex. B, p. 1270, ls. 1–5). While she was in the U.S., she never spoke with an official from the Mexican government. (Def. Ex. B, p. 1270, ls. 10-13). When she was arrested by the police, Briselda did not speak with the police about her problem. (Def. Ex. B, p. 1270, ls 14-17). Briselda could not recall going to court after her arrest. (Def. Ex. B, p. 1271, ls. 4-6). Briselda could not recall if after her arrest she spoke with a lawyer. (Def. Ex. B, p. 1271, ls. 10-12).

Cross Examination By Jose Zarate Morales's Counsel

Briselda could not recall the name of the family she worked for in Mexico City or what part of Mexico City they lived in. (Def. Ex. B, p. 1285, ls. 2-8).

Briselda testified that Luz got her a job at LaVictoria Pizzeria in Queens. (Def. Ex. B, p. 1285, l. 25 to p. 1286, l. 4). Then she stated she couldn't remember if she got the job or Luz got her the job. (Def. Ex. B, p. 1286, ls. 6-7). Briselda could not remember if she got fired from LaVictoria. (Def. Ex. B, p. 1287, ls. 23-24). She only went to work for a few days. (Def. Ex. B, p. 1287, l. 1 to p. 1288, l. 6).

Briselda stated that she never identified a picture of Omar to law enforcement, she never contacted Omar on behalf of law enforcement, and to her knowledge law enforcement never confirmed he existed. (Def. Ex. B, p. 1289, ls. 5-12).

Briselda did not remember telling the FBI in December 2017 that she had a boyfriend who lived at Luz's house. (Def. Ex. B, p. 1290, ls. 8-10). Briselda confirmed that Jose Reynaldo bought her a bedroom set, but he was not her boyfriend. (Def. Ex. B, p. 1290, ls. 11-17).

Briselda could not remember if she was arrested in Chinatown. (Def. Ex. B, p. 1296, l. 24 to 1297, l. 5). After the arrest, she lied to the police about her age. (1299, ls. 2-3). She could not remember if she gave the police Luz's address. (Def. Ex. B, p. 1299, ls. 4-5). Briselda could not remember whether she was hoping that if the police were going to call someone to pick her up, it would be Veronica. (Def. Ex. B, p. 1300, ls. 3-8).

Briselda recalled being shown the transcript of the Grand Jury, but could not recall the Grand Jury. (Def. Ex. B, p. 1303, ls. 8-10).

Briselda stated that she could not remember when she came to the U.S. for the first time. (Def. Ex. B, p. 1308, ls. 8-10). She stated that she came back to the U.S. in 2021, not 2022 because she has had a job for two years. (Def. Ex. B, p. 1328, ls. 4-21). When she came in

2021, she had permission to enter the country. (Def. Ex. B, p. 1328, l. 24 to p. 1329, l. 1). She applied for permission to work legally but she has permission to stay until 2025. (Def. Ex. B, p. 1329, ls. 2-10). The FBI helped her get continued presence status and she is currently working. (1329, ls. 11-15). The money she makes allows her to send money back to Mexico. (Def. Ex. B, p. 1329, ls. 21-25). Briselda said that she is able to work in this country because she got permission to do so. She also stated that she got permission to do so because of her participation in this case. (Def. Ex. B, p. 1331, ls. 4-9).

**Family Court Proceeding**

When Briselda was arrested in the brothel in Chinatown, the Administration for Children's Services started an action in Family Court in Queens in which Luz and Jose Facundo Zarate Morales were respondents. Dkt. No. NN-14188 of 2008. As noted above, Briselda had been placed in foster care but then ran away from foster care. After Briselda ran away, the case in Family Court was dismissed.

**Supervised Release**

Supervised Release by statute is 5 years to life on Counts 3 and 4. (18 U.S.C. § 3583(k); see PSR ¶ 229). For Count 6, a class D felony, the statutory term of supervised release is not more than three years. (18 U.S.C. § 3583(b)(2); see PSR ¶ 229). Multiple terms of supervised release run concurrently. (18 U.S.C. § 3624(e); see PSR ¶ 230).

The Sentencing Guidelines prescribe for Counts Three and Four a term of five years to life pursuant to U.S.S.G. § 5D1.2(b)(2). Application Note 1 specifically defines 18 U.S.C. § 1591 offenses and violations of 18 U.S.C § 2423 (18 U.S.C. Ch. 117 offenses) as a "sex offense." Count 6, as a Class D felony, carries a guideline range of 1 to 3 years. (U.S.S.G. § 5D1.2(a)(2); see PSR ¶ 231).

**Restitution**

Restitution is mandatory under 18 U.S.C. § 3663A because Sex Trafficking of a Minor is a crime of violence under Section 3663A(c)(1)(A)(i). However, as the PSR points out losses are unknown and restitution cannot be determined. (PSR ¶ 240).

**Fine and Assessments.**

The PSR concludes that based on the defendant's financial profile, she (Luz) appears unable to pay a fine or the Justice for Victims of Trafficking Act of 2015 assessments. (PSR ¶ 226). The maximum fine on each count is $250,000 as is prescribed for a felony conviction in 18 U.S.C. § 3571(b)(3). The guideline range for this offense is $50,000 to $250,000. U.S.S.G. § 5E1.2(c)(1)(3). However, the guideline also states, "The court shall impose a fine in all cases, except where the defendant establishes he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). The Presentence Report establishes that Ms. Cardona is unable to pay a fine. (PSR ¶ 226). Given this conviction, her prospects that she will be able to pay a fine in the future is not likely.

The Justice for Victims of Trafficking Act of 2015, 18 U.S.C. § 3016, allows for the imposition of an assessment of $5,000 on any non-indigent person. (18 U.S.C. § 3016(a), PSR ¶ 236). Luz is indeed indigent. (PSR ¶ 226). As a result, under 18 U.S.C. § 3016(a), the assessment should not be levied against her.

**The Sentencing Statute, 18 U.S.C. § 3553(a)**

The Sentencing Guidelines are but one factor the Court is to consider in imposing sentence. 18 U.S.C. § 3553(a) is the primary sentencing provision post-<u>Booker</u>. The statue prescribes imposing "a sentence sufficient but not greater than necessary, to comply with the purposes set forth . . . (in the sentencing statute)." The statute presents numerous points for the Court to evaluate in passing sentence.

The History and Characteristics of Defendant
<u>The Nature and Circumstances of the Offense</u>

Count Three, charging Sex Trafficking of a Minor, is alleged to have occurred between September 2007 and May 2008. (PSR ¶ 2). In this time frame, Ms. Cardona was 19 years old, turning 20 during May 2008. Additionally, Ms. Cardona gave birth to her first child, Justin, in this time period. (<u>See</u> PSR ¶ 206 [Justin was 16 years old on the date of the PSR, 4/30/24]). As noted above, Briselda testified that she did not have reason to believe her Aunt Luz knew she was fifteen years old at the time. (TT, p. 1146, ls. 17-22).

Significantly, Ms. Cardona was the victim of trafficking herself. In 2006, she was forced into prostitution. (PSR ¶ 222). In early, 2006, she was smuggled into the United States by a man named Carlos. (PSR ¶¶ 199-201). Ms. Cardona says that she was 17 years old when she was brought to the United States in 2006. Ms. Cardona also says that Carlos was 33 years old. Ms. Cardona was prostituted by Carlos on her first day in Queens. (PSR ¶ 201). After working as a prostitute for Carlos for approximately three months, she escaped from him. (PSR ¶¶ 204-205).

Ms. Cardona was treated like a sex slave by Carlos. (PSR ¶ 204). Indeed, her time as a trafficked woman was dangerous and harrowing. In one house on Long Island, Ms. Cardona had to service a group of men she described as "gangbangers." (PSR ¶ 203). A man in this house held a knife to Ms. Cardona's neck, when she wouldn't comply with his demands. (PSR ¶ 203).

Ms. Cardona's arrest and trial resulted in her separation from her three children Justin aged 16, Nicole, aged 13, and Joshua, aged 9. The children are the product of the lawful marriage of Ms. Cardona and co-defendant Jose Zarate Morales. (PSR ¶ 206). Ms. Cardona described her relationship with Jose Zarate Morales as "nice and stable." (PSR ¶ 206). The three children are in the custody of the foster care system. (PSR ¶ 206). Ms. Cardona visits with her children once a month and a social worker handling all three children described Ms. Cardona as a proud mother of her children. (PSR ¶ 206). However, Justin suffers from depression and anxiety. (PSR ¶ 206). Ms. Cardona says he is also obese, pre-diabetic and has fatty liver disease.

In addition to being trafficked in the United States, Ms. Cardona was raped in Mexico. (PSR ¶ 197). She was twelve or thirteen years old when this occurred. (PSR ¶ 197). She also endured verbal abuse from her brothers' alcohol abuse. (PSR ¶ 198).

Ms. Cardona's home and school were destroyed by a hurricane in 2005. (PSR ¶ 199). Ms. Cardona's parents could not afford to send her to another school. (PSR ¶ 199). As a result, she did not attain her formal high school degree and completed up to the second year of high school. (PSR p. 2; PSR ¶ 216). However, she did receive her GED while at MDC. (PSR ¶ 209).

While Luz has been incarcerated, her mother died. (PSR ¶ 193). This was in December 2021. (PSR ¶ 193). Ms. Cardona also says that here father got into a motorcycle accident and has brain inflammation. She cannot be there to help him out.

From 2018 through her arrest in 2021, Ms. Cardona was an avid member of Jehovah's Witnesses. She delivered sermons twice a week. (PSR ¶ 219). Additionally, Luz had a cooking business in which she sold Mexican food to the Jehovah's Witnesses community. (PSR ¶ 219). Before Luz started her cooking business, she was a homemaker. (PSR ¶ 220). Before Luz had children, she worked at a restaurant in Corona. (PSR ¶ 220).

Letters of Support

Letters of Support provide perceptive insight from those who know a defendant. The Letters of Support are summarized below and are attached to this letter.

Spanish Language Letters With Translations Provided By Federally Certified Translator Alex Wieder – Def. Exhibits F-1 to F-9

Rosa Barrios Gonzalez - Def. Exhibit F-1

Ms. Barrios Gonzalez is Luz's sister-in-law. She states that Luz was always respectful. toward her parents. She states that Luz always made an effort to do things right. She also states that Luz has a good heart.

Gladys Carcamo - Def. Exhibit F-2

Gladys Carcamo has known Luz for over six years. She describes Luz as a very kind, hospitable and helpful woman. She states that Luz is not a bad person. On the contrary, she is a good person and a good mother.

Maria Evelia Cardona Bamaca - Def. Exhibit F-3

Ms. Cardona Bamaca is Luz's sister. She states that Luz worked to help their mother and father with what little she could. She describes Luz as a good daughter, mother, and sister.
Nehemias Cardona Bamaca - Def. Exhibit F-4

11

Luz is Nehemias's sister.  Nehemias describes Luz as a good person, a good sister and a good daughter to Luz's parents.

Nelfin Isai Cardona Bamaca - Def. Exhibit F-5

Luz is Nelfin's sister.  Nelfin describes Luz as hardworking and states that Luz was raised with the values and ethical principles of a Christian family.

Usberto Cardona Barrios - Def. Exhibit F-6

Mr. Cardona Barrios is Luz's father and he states that he taught her good principles and to work honestly and with humility

Vitalina Garcia Samayoa - Def. Exhibit F-7

Ms. Garcia Samayoa states that she has known Luz since Luz was a child.   Ms. Garcia Samayoa describes Luz as a hardworking, respectful person of good customs, of principles and moral values.

Abraham Hernandez Hernandez - Def. Exhibit F-8

Mr. Hernandez Hernandez has known Luz since they were both little.  He states that she is hardworking, respectful and a humble woman.  He says that she congregates at the church and leads a peaceful life.

Dulce Hernandez Morales - Def. Exhibit F-9

Ms. Hernandez Morales is the sister-in-law of Luz.  She describes Luz as "a good woman, a good wife, an excellent mother there is no complaint whatsoever about her.  She is an excellent daughter in law and mother in law a respectful woman, responsible, and very hardworking at their home and very active with her duties as a Christian, her children and all the people who know her."

Spanish Language Letters With Translations Provided By Federally Certified Translator Alex Wieder – Def. Exhibits F-10 to F-17

Carl Hulz - Def. Exhibit F-10

Mr. Hulz states that Luz is a woman devoted to studying the word of God.  She has words of encouragement daily for others.

Rosalia Juarez Juarez - Def. Exhibit F-11

Ms. Juarez states that Luz is a hardworking woman.  She says that Luz's parents raised her under values and principles.

12

Kaila Marcano - Def. Exhibit F-12

Kaila Marcano states that Luz is a good person, very worthy and with a good heart. She says further that Luz is polite, honest, warm, funny, loving respectful, helpful, worthy of trust, fearful of God, and has very good manners. She also says that she gives her children beautiful words of consolation.

Amilcar Orozco Bamaca - Def. Exhibit F-13

Mr. Orozco Bamaca is Luz's brother. He states that Luz has always been a hardworking daughter. She has always taught them the good and not the bad. He asks God for Luz to walk free for her children.

Juan Carlos Reyes Almaguer - Def. Exhibit F-14

Mr. Reyes Almaguer states that the congregation of Jehovah Witnesses were Luz's life. Luz was always preaching with her children and taking care of the home's chores.

Marjorie Judith Reyes Lopez - Def. Exhibit F-15

Is a friend of Luz from the congregation Ms. Reyes Lopez belongs to in Flushing, New York. She has known Luz since 2016. She describes Luz as spiritual, diligent and reliable. She states that Luz is an example for all the other mothers and brothers from the congregation.

Gloria Rodriguez Gonzalez - Def. Exhibit F-16

Gloria Rodriguez Gonzalez says that Luz believes in Divine Justice and that of man. She says that Luz's children need Luz and Luz needs a second opportunity to retake the path and to be able to finish raising her three children. She describes Luz as super-hardworking, helpful, and polite.

Alicia Beatriz Villanueva Aguilar - Def. Exhibit F-17

Ms. Villanueva Aguilar is a sister in law of Luz. She says that in Mexico, Luz was a good student and a good daughter. Her in-laws instilled in Luz to work honestly and always walk the Lord's path.

English Language Letters - Def. Exhibits G-1 to G-11

Sinmyah Amera Ceasar – Def. Exhibit G-1

Ms. Ceasar states that Luz is caring, fun, loving and well mannered. She says that Luz is a thoughtful person and deserves a second chance.

Aria Anderson – Def. Exhibit G-2

13

Aria Anderson describes Luz as a nurturer, kindhearted and loving.

Kelcey Collins – Def. Exhibit G-3

Kelcey Collins states that Luz is the first to help newcomers with food, clothing and emotional support.

Kimberly Del Rio – Def. Exhibit G-4

Ms. Del Rio states that Luz Cardona has always been the first to offer her food and assistance and food to anyone in any form. She writes that she is confident that whatever sentence Luz receives, Luz will be rehabilitated into the community.

Goddess Earl – Def. Exhibit G-5

Goddess Earl states that Luz gives nothing but the best in moral and spiritual support through prayer and counsel. She describes Luz as a truly good person.

Sherrell Farnsworth – Def. Exhibit G-6

Ms. Farnsworth states that Luz lights up the room wherever she goes with her beautiful presence. Ms. Farnsworth states that Luz makes the best of her situation.

Amanda Graham – Def. Exhibit G-7

Ms. Graham writes that "since the day I arrived at the MDC she (Luz) has been nothing but kind and giving."

Charmeca Harris – Def. Exhibit G-8

Ms. Harris writes that Luz is a very giving and kindhearted person. She is always quick to help a person in need. She describes Luz as a person with a heart of gold.

Irma Jara – Def. Exhibit G-9

Irma Jara describes Luz as "very helpful and is always welcoming to any and all inmates."

Tracey Martin – Def. Exhibit G-10

Tracey Martin writes that Luz is very sweet, caring and compassionate. She also states that Luz teaches the word of God. Ms. Martin comments that Luz is a bright light for people in MDC.

Stacey Sellner – Def. Exhibit G-11

Stacey Sellner says that Luz has a very caring and overall humble demeanor.

Joshua Zarate Cardona – Def. Exhibit G-11

Joshua is ten years old. In his letter, he explains why he cars so much for his mom.

Nicole Zarate Cardona – Def. Exhibit G-12

Nicole is 13 year sold. She discusses nice things about her mom.

Ms. Cardona Earned her GED While at MDC Brooklyn And Has
Taken Advantage of Other Self-Improvement Programs At MDC Brooklyn – Def. Exhibit H

Ms. Cardona earned her GED while at MDC Brooklyn. (PSR ¶ 215). Luz has proudly taken advantage of self-improvement courses at MDC Brooklyn, She has taken the following courses as evidenced by the certificates of completion: "GED: Artes de Lenguaje," "High School Equivalency Credential," "The Ten Soft Skills You Need," "The National Parenting Program: Phase One," "Work Performance Rating – Inmate," "Sentry Origami Course," "Stress Management Course," "Square One: Essentials for Women," "Women In The 21st Century Workplace," "Crochet Sentry Class," "Astronomia," "English As A Second Language," "Assert Yourself," "Start Now," "To Parent Or Not To Parent," "Structured Exercise Program," "Sentry Journal," and "Drawing Course."

In a letter dated August 29, 2024 from Correctional Counselor Stephen Espinet to the Court, the Counselor states that Ms. Cordon-Bamaca has received no incident reports. Def. Ex. I. He also points out that she has completed several education and self-help courses including her GED. He encloses Ms. Cordon-Bamaca's current education/self-help transcript. He notes that Ms. Cordon-Bamaca has worked as a unit orderly and as an institution laundry and her wok performance has been outstanding with minimal supervision. He concludes by saying "(s)he has shown commitment in utilizing her incarceration for a positive outlook in life."

This industriousness by Ms. Cardona demonstrates that she is a serious person with hope for redemption from this experience.

Other 18 U.S.C. § 3553(a) Factors

18 U.S.C. § 3553(a)(2) lists other factors the Court must consider in arriving at its sentence. These include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense to afford adequate deterrence, to protect the public from further crimes of defendant, to provide the defendant with needed educational or vocational training and medical care. The Court must also consider the Sentencing Guidelines and Sentencing Commission polices, avoid unwarranted sentencing disparities an provide for restitution.

We respectfully request a sentence that is considerably below the mandatory minimums of 15 years on Count 3 and 10 years on Count 4. This would be in consideration of our Departure/Variance motion immediately below.

Such a sentence would be "a sentence sufficient but not greater than necessary, to comply with the purposes set forth . . . (in the sentencing statute)."

**Factors That Warrant Departure/Variance**

The PSR points out that there are a number of factors that may warrant departure or a variance. (PSR ¶ 246). These include the fact that in her childhood, Luz endured sexual abuse for about one month and experienced verbal mistreatment by an older sibling because of his alcohol abuse. Additionally, the PSR cites as a basis that when Luz was 17 years old, she was displaced from her childhood home (and her school) by Hurricane Stan. A further basis cited by the PSR is the fact that in 2006, Luz was smuggled into the United States and became a victim of sex trafficking by an older man for about three months. Also, the PSR cites the fact that Luz's own children have been placed in the foster care system as a product of the instant offense. Luz's loss of her husband, Jose Facundo Zarate Morales, the father of her three children, makes the destruction of her family complete.

Defendant also has been on lockdown at MDC Brooklyn by her estimate on about 10 occasions. Ms. Cardona also states that drug taking by the woman with whom she is incarcerated is widespread and she has to deal with that drug taking. Ms. Cardona also notes that last June, the BOP brought 100 women prisoners from elsewhere to MDC making it a more crowded facility. Additionally, two recent murders in the men's West Building of MDC demonstrate how dangerous the facility has become.

These are all extraordinary and compelling reasons for the Court to exercise its discretion in accordance with the First Step Act to depart downward from the mandatory minimums.

"Pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." U.S. v. Phillibert, 557 F.Supp.3d 456, 460 (S.D.N.Y. 2021)(quoting U.S. v. Carty, 264 F.3d 191, 196-197 (2d Cir. 2001); see also U.S. v. Sanpedro, 352 F.App'x 482, 486 (2d Cir. 2009) (SUMMARY ORDER)(noting that in passing sentence, the district court considered the harsh conditions defendant had experienced in a Colombian jail before being extradited); U.S. v. Torres, No. 01 Cr. 1078, 2005 WL 2087818, *2 (S.D.N.Y. Aug. 30, 2005)("departing downward by 1 level, because of the harsh conditions of defendant's pretrial detention").

A district court "may reduce" the terms of a defendant's imprisonment "if it finds that . . . extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A). The determination as to what constitutes extraordinary and compelling reasons warranting a reduction is committed to the sound discretion of the district court. U.S. v. Brooker, 976 F.3d 228, 236-237 (2d Cir. 2020). In Brooker, the Second Circuit held that "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." Brooker, 976 F.3d at 237. "The only statutory limit on what a court may consider to be extraordinary and compelling is that 'rehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.' 28 U.S.C. § 994(t) (emphasis supplied)." Brooker, 976 F.3d at 237-238. In

Brooker, the Second Circuit noted that defendant did not rely solely on his rehabilitation. Rather, he relied on other factors as well, which "may also interact with the current coronavirus pandemic." Brooker, 976 F.3d at 238 (citing U.S. v. Zukerman, 451 F.Supp.3d, 329, 336 (S.D.N.Y 2020)(granting compassionate release because of the risk of Covid-19); U.S. v. Colvin, 451 F.Supp.3d 237, 241-242 (D. Conn. 2020)(same); U.S. v. Rodriguez, 451 F.Supp.3d 392, 406-407 (E.D. Pa. 2020)(same). The Second Circuit remanded "to allow the district court to consider the possible relevance of these and any other factors, and to exercise the discretion that the First Step Act gives to it." Brooker, 976 F.3d at 238 (see also U.S. v. Torres, 464 F.Supp.3d 651, 659, 662-665 (S.D.N.Y 2020)(granting compassionate release based in part on rehabilitation, exemplary community service and the high risk due to the COVID-19 pandemic).

"Prior to reducing a defendant's term of imprisonment, however, a district court must consider 'the factors set forth in section 3553(a) to the extent that they are applicable.'" U.S. v. Roney, 833 Fed. Appx. 850, *852 (2d Cir. 2020)(SUMMARY ORDER)(quoting 18 U.S.C. 3582(c)(1)(A)).

"The Covid-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals." U.S. v. Kissi, 469 F.Supp.3d 21, *32 (E.D.N.Y. 2020)(quoting U.S. v. Williams-Bethea, No. 18-CR-78, 2020 WL 2848098 (S.D.N.Y. Jun. 2, 2020). The Kissi court cited "near-constant lockdown, without access to educational and rehabilitative programs" along with the inability to receive social visits as some of the characteristics of incarceration at MDC Brooklyn that amounted to extraordinary and compelling circumstances warranting compassionate release. Kissi, 469 F.Supp.3d at *39-*40. Judge Engelmayer has stated:

> In the Court's judgment, a day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing.

U.S. v. Mcrae, 17-Cr-643 (PAE), 2021 WL 142277, *5 (S.D.N.Y. Jan. 15, 2021). One court refused to remand a defendant to custody prior to sentencing citing conditions at MDC Brooklyn. U.S. v. Boyd, 21-cr-486 (SHS), 2022 WL 790771, *2 (S.D.N.Y. Feb. 3, 2022)(citing overcrowding at MDC Brooklyn after the closure of the Metropolitan Correctional Center and the inability, at the time, of attorneys to carry on in-person visits to prepare with clients).

For all the reasons just described, Luz's rape experience as a young teenager, her sexual trafficking by Carlos, Luz's painful separation from her three young children and husband, the destruction of Luz's home and school by Hurricane Stan, the death of her mother during her incarceration and her father's current illness, and the lockdowns, point to the fact that a significant downward departure below the mandatory minimums of 15 years and 10 years is warranted.

Defendant provided responses and objections to the PSR in a letter dated May 31, 2024. Dkt No. 306. (Def. Ex. J).

**Conclusion**

For all of the above reasons, we respectfully request a sentence significantly below the the mandatory minimums of 15 years on Count Three and 10 years on Count Four. Such a sentence is consistent with 18 USC § 3553(a) and the First Step Act and are warranted.

                                                  Respectfully submitted,

                                                  Gary L. Cutler, P.C.

                              By:     /s/ Gary L. Cutler
                                                Gary L. Cutler

cc:     Counsel of record via CM/ECF
        Probation Officer Frank Nikolaidis (via email)